COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-098-CR

 

 

MARLON TYRONE ROBERSON                                                        APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I.  Introduction

Appellant
Marlon Tyrone Roberson appeals his conviction for theft from a person.  In two points, Roberson argues that the trial
court erred by not suppressing identification evidence and that the evidence is
legally and factually insufficient to prove identity.  We will affirm.

II.  Factual and Procedural Background








On
May 14, 2008, Cindy Miller was working at a Metro PCS store in Fort Worth when
she observed an individual, whom she later identified as Roberson, enter the
store and hand her a note.  Roberson was
wearing a blue shirt with white stripes, a hat, and sunglasses.  Miller saw the word Arobbery@ in
the note, handed the note back to Roberson, and turned over about $200 to him.
Roberson ran out of the store just as Shin Kim, the manager, was entering the
store.  Miller told Kim that she had been
robbed, and Kim turned around and chased Roberson.  After alerting the employees of a nearby
business that she had been robbed, Miller entered her vehicle to search for Kim
and called 911.

Jerry
Griffith, a customer of the Metro PCS store, happened to be driving by the
store when he saw Kim chasing an individual, whom Griffith later identified as
Roberson, and yelling, APlease give me my money
back.@  Griffith grabbed his Taser and joined the
chase, eventually catching up with Kim. 
Kim and Griffith caught up with and confronted Roberson after he had
jumped a fence into a backyard and ran to a gate, which was locked.  Griffith Azapped@ his
Taser a few times and told Roberson to turn over the money.  Roberson threw the money at Kim and Griffith,
jumped over the fence, and ran off.








Miller
picked Kim up in her car and headed back to the Metro PCS store. As Miller was
waiting to cross a street, she observed Roberson, who was now wearing a white
shirt, peeking out from a hole in a wooden fence.[2]  Miller told the 911 operator that she had
spotted the person who had robbed her. Meanwhile, Griffith, who was also making
his way back to the Metro PCS store, saw Roberson run from the hole in the
fence, across the street, and to a Cadillac that was parked next to an Italian
restaurant.  Griffith observed Roberson
look or reach into the Cadillac before running into the Italian restaurant.

Officer
Carl Pollak was dispatched to the Metro PCS store.  Just before arriving at that location, an
individual matching the suspect=s
description (black male, five-and-a-half-feet tall, weighing approximately 250
pounds) ran across the street and in front of Officer Pollak=s
patrol unit.  Officer Pollak had to brake
hard to avoid hitting the person, whom he later identified as Roberson.  Officer Pollak observed Roberson run to a
Cadillac and then into the Italian restaurant. Officer Pollak and another
officer made their way to the Italian restaurant, where they found Roberson in
a bathroom and arrested him.








Griffith
observed the officers taking Roberson out of the Italian restaurant. An officer
later escorted Griffith to a police unit, where Griffith identified Roberson,
who was sitting inside the police unit, as the person he had seen coming out of
the Metro PCS store and had chased, but Griffith noted that Roberson had
removed his hat and sunglasses and changed shirts.[3]  Miller also observed officers taking Roberson
out of the Italian restaurant, and an officer escorted her to the police unit,
where she identified Roberson as the person who had taken the money at the
Metro PCS store.  The following day, a
detective showed Miller a photographic lineup, and she identified Roberson as
the person from the Metro PCS store.  The
detective testified at a hearing to suppress Miller=s
identification of Roberson that he was not familiar with the Department of
Justice=s AStudy
and Guide for Law Enforcement on Recommendations for Conducting Identification
Procedures.@

Officers
walked the area where the chase had occurred and found a hat, sunglasses, and a
blue-and-white striped shirt near a bush. 
The blue-and-white striped shirt was a ARoca
Wear@
brand shirt, size 5X.  Officers also
discovered a green-and-white striped shirt inside of the Cadillac that was a ARoca
Wear@
brand shirt, size 5X.

Roberson
was charged with robbery, but a jury convicted him of theft from a person.  The trial court, having found the enhancement
allegations true, sentenced him to twenty years=
confinement.

III.  Identification Evidence








In
his first point, Roberson argues that the trial court erred by overruling his
motion to suppress Miller=s and Griffith=s
in-court identifications of him.  He
contends that the in-court identifications were tainted by impermissible
pretrial identification procedures that gave rise to a substantial likelihood
of misidentification because both showups occurred at a police unit in which
Roberson sat alone and under arrest, the detective who showed Miller the
photographic lineup failed to follow identification procedures as set by the
Department of Justice, both Miller and Griffith observed police escorting
Roberson out of the Italian restaurant, Roberson was wearing sunglasses when Miller
saw him for only one or two minutes and when Griffith saw him, and Miller
identified Roberson based primarily on his body type instead of his face.

A.      Standard of Review








We
review a trial court=s ruling on a motion to
suppress evidence under a bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  We give almost total
deference to a trial court=s
rulings on questions of historical fact and application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor, but we review
de novo application-of-law-to-fact questions that do not turn on credibility
and demeanor.  Amador, 221 S.W.3d
at 673; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson
v. State, 68 S.W.3d 644, 652B53
(Tex. Crim. App. 2002). The point raised by RobersonCthat
the complained-of pretrial procedures were impermissibly suggestive and gave
rise to a substantial likelihood of misidentificationCis a
mixed question of law and fact that we review de novo.  See Loserth v. State, 963 S.W.2d 770,
772B73
(Tex. Crim. App. 1998).

In
determining whether a trial court=s
decision is supported by the record, we generally consider only evidence adduced
at the suppression hearing because the ruling was based on it rather than
evidence introduced later.  See
Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); Rachal
v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.), cert. denied, 519
U.S. 1043 (1996).  However, when the
parties consensually relitigate the suppression issue during the trial on the
merits, we consider all evidenceCfrom
both the pretrial hearing and the trialCin
our review of the trial court=s
determination.  Gutierrez, 221
S.W.3d at 687.  Here, the trial court
denied Roberson=s motion to suppress Miller=s
in-court identification of him after it had heard the testimony of Miller and
an investigator with the Fort Worth Police Department.  The trial court denied Roberson=s
motion to suppress Griffith=s
in-court identification after it had heard Griffith=s
testimony.  The parties relitigated the
suppression issue at trial; therefore, we will consider the evidence presented at
both the suppression hearings and the trial.

B.      Identifications








We
use a two-step analysis to determine whether the trial court was correct in
admitting an in-court identification:  (1) whether the pretrial
identification procedure was impermissibly suggestive and, if so,
(2) whether the suggestive pretrial procedure gave rise to a substantial
likelihood of irreparable misidentification. 
Ibarra v. State, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999), cert.
denied, 531 U.S. 828 (2000); Delk v. State, 855 S.W.2d 700, 706
(Tex. Crim. App.), cert. denied, 510 U.S. 982 (1993).  The appellant must show by clear and
convincing evidence that the witness=s
in-court identification was so tainted.  Madden
v. State, 799 S.W.2d 683, 695B96
(Tex. Crim. App. 1990), cert. denied, 499 U.S. 954 (1991).








In
determining whether the suggestive procedure gave rise to a substantial
likelihood of irreparable misidentification, we examine the totality of the
circumstances.  Delk, 855 S.W.2d
at 706; Madden, 799 S.W.2d at 695. If the totality of the circumstances
reveals no substantial likelihood of misidentification despite a suggestive
pretrial procedure, then subsequent identification testimony will be deemed
reliable, and therefore admissible, as reliability is the linchpin in
determining the admissibility of identification testimony.  Madden, 799 S.W.2d at 695.  The following five non-exclusive factors
should be weighed against the corrupting effect of any suggestive
identification procedure in assessing reliability:  (1) the
witness=s
opportunity to view the criminal at the time of the crime, (2) the witness=s
degree of attention, (3) the accuracy of the witness=s
prior description of the suspect, (4) the witness=s
level of certainty at the time of confrontation, and (5) the time between
the crime and confrontation.  Ibarra,
11 S.W.3d at 195 (citing Neil v. Biggers, 409 U.S. 188, 199B200,
93 S. Ct. 375, 382 (1972)); see Luna v. State, 268 S.W.3d 594, 605 (Tex.
Crim. App. 2008), cert. denied, 130 S. Ct. 72 (2009).[4]

C.      Miller=s
In-Court Identification








Assuming
without deciding that the complained-of pretrial identification procedures were
impermissibly suggestive, we move directly to the second prong of the inquiry and
determine whether the alleged suggestive procedures gave rise to a substantial
likelihood of irreparable misidentification. 
See Winter v. State, No. 14-08-01138, 2010 WL 605330, at *4 (Tex.
App.CHouston
[14th Dist.] Feb. 23, 2010, no pet.) (mem. op., not designated for
publication); Stokes v. State, No. 03-02-00508-CR, 2003 WL 21401267, at
*2 (Tex. App.CAustin
June 19, 2003, no pet.) (mem. op., not designated for publication).  The record shows that the theft occurred
between 12:00 and 12:30 p.m.  Miller
testified that she saw Roberson just outside of the Metro PCS store before he
entered the store and that she Agot
a look at him@
when he was Ain
[her] face at the store.@  Roberson was wearing sunglasses and a hat and
was in the store for A[n]o more than a minute or
two,@ but
Miller was able to see his body type and the parts of his face that were not
covered by the sunglasses.

Miller
saw Roberson a second time peeking through the hole in the fence. She observed
that it was Roberson peeking through the fence even though he had removed his
hat and sunglasses and was wearing a white shirt instead of the blue-and-white
striped shirt that he wore at the Metro PCS store.  Miller told the 911 operator that she had
spotted the same person who had taken the money at the Metro PCS store.

Miller
testified that before she went to the patrol unit to identify Roberson, she had
had Anumerous
times to see@ him
and had told the police that the person they had taken out of the Italian
restaurant was the same person who had robbed her.  Miller recognized Athe
body build, the length of his height[,] and his face.@  When Miller identified Roberson at the patrol
unit, she based the identification on her memory of Roberson from the Metro PCS
store, even though she had observed officers taking Roberson out of the Italian
restaurant.








Detective
Lauren Tracy met with Miller the following day and showed her a photographic
lineup that contained six photographs, including one of Roberson.  Detective Tracy used photographs of
individuals who resembled Roberson, instructed Miller that the person being
investigated may or may not be in the photographs, in no way suggested that
Roberson was in the lineup, and did not say anything to Roberson after showing
her the photographs.  Miller identified
Roberson within a matter of seconds as the person from the Metro PCS
store.  She testified that she was Aa
hundred percent sure@ of her identification,
which she based on the opportunities she had to observe Roberson at the Metro
PCS store and peeking through the fence.








Each
of the Biggers factors weighs in favor of finding that Miller=s
in-court identification was reliable: 
Miller had several opportunities to view Roberson; she exercised a high
degree of attention to Roberson=s
appearance throughout the ordeal, recognizing that he had changed clothes
between the time that he was at the Metro PCS store and the time that Miller saw
him at the fence; she never offered conflicting descriptions of Roberson; her
level of certainty regarding the identification was high; and the time between
the crime and her identifications of Roberson at the patrol unit and in the
photographic lineup was minimal.  See
Biggers, 409 U.S. at 199B200,
93 S. Ct. at 382.  Accordingly, after
reviewing the totality of the circumstances, we conclude and hold that Roberson
did not show by clear and convincing evidence that the State=s
alleged impermissibly suggestive pretrial identification procedures (having
Miller identify Roberson as he sat in the police unit and Detective Tracy=s
alleged failure to follow Department of Justice procedures in showing Miller
the photographic lineup) gave rise to a substantial likelihood of irreparable
in-court misidentification by Miller.  See
Ibarra, 11 S.W.3d at 195.  We
overrule this part of Roberson=s
first point.

D.      Griffith=s
In-Court Identification

Griffith
testified that he saw Kim chasing Roberson from the Metro PCS store.  He described Roberson at that point as Ashorter
than [him]@ and
wearing a hat, sunglasses, and a blue or red striped shirt.  Griffith caught up with Roberson in a
backyard and confronted him with a Taser. 
After Roberson discarded the money and jumped the fence, Griffith
watched Roberson run away.

When
Griffith was making his way back to the Metro PCS store, he saw Roberson run
from the hole in the fence, across the street, and to a Cadillac that was
parked next to an Italian restaurant. 
Griffith recalled that Roberson was no longer wearing sunglasses and a
hat and was maybe wearing a white shirt instead of the striped shirt.  He observed Roberson look or reach into the
Cadillac before running into the Italian restaurant, and he described Roberson
as being Ain a
big hurry.@

Before
police arrested Roberson, they detained a different person; but Griffith told
police, AThat=s
the wrong guy.  [Roberson] just ran into
the Italian [restaurant].@  Griffith observed the officers taking
Roberson out of the Italian restaurant, but he testified that his in-court
identification of Roberson was based on his memory of seeing Roberson=s
face in the backyard.  He could not
recall if anyone showed him a photographic lineup.








The Biggers
factors weigh in favor of finding that Griffith=s
in-court identification of Roberson was reliable.  See Biggers, 409 U.S. at 199B200,
93 S. Ct. at 382.  Accordingly, after
reviewing the totality of the circumstances, we conclude and hold that Roberson
did not show by clear and convincing evidence that the State=s
alleged suggestive pretrial identification procedures gave rise to a
substantial likelihood of irreparable in-court misidentification by
Griffith.  See Ibarra, 11 S.W.3d
at 195.  We overrule the remainder of
Roberson=s
first point.

IV.  Evidentiary SufficiencyCIdentity








In
his second point, Roberson argues that the evidence is legally and factually
insufficient to prove his identity as the person who took the money from the
Metro PCS store.  He contends that the Acorrupt
pre-trial identification procedure[s]@
delineated in the first point negated Miller=s
and Griffith=s in-court
identifications of him and that the evidence is, therefore, legally and
factually insufficient to prove identity. 
Having overruled Roberson=s
first point challenging the admissibility of Miller=s
and Griffith=s
in-court identifications, Roberson=s
second point, which is expressly contingent on our sustaining his first point,
is accordingly unpersuasive.  Further,
under the appropriate standards of review,[5]
we hold that the evidence is legally and factually sufficient to support
Roberson=s
identity.  We overrule Roberson=s
second point.

V.  Conclusion

Having
overruled Roberson=s two points, we affirm the
trial court=s
judgment.

 

 

BILL MEIER

JUSTICE

 

PANEL:   LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

 

LIVINGSTON, C.J.
concurs without opinion.

 

DO NOT PUBLISH

Tex. R. App. P.
47.2(b)

 

DELIVERED:  June 3, 2010











[1]See Tex. R. App. P. 47.4.





[2]A police officer
testified that the part of the fence with the Ahole@ in it looked like it
had been knocked down or that it was a Apass-through.@





[3]The State refers to
this procedure as a field showup.  See
Pace v. State, 986 S.W.2d 740, 743 (Tex. App.CEl Paso 1999, pet.
ref=d) (stating that a
showup Ais a police procedure
where the actual victim of a crime or other witness is brought to a location to
look at a suspect to see if the victim or witness can identify the suspect@).





[4]Roberson contends
that Ain light of the
numerous, well publicized and quite startling evidence of known
misidentifications, a reassessment and examination of the presently acceptable
identification procedures should be considered.@  He directs us to a number of articles or
publications and Acalls upon the court
to enter a judicial ruling imposing a standard to eliminate continued use of
what all scholars on the subject agree is risky methodology.@ We decline Roberson=s request.  None of the articles or publications that he
directs us to were admitted at trial.  See
Perkins v. State, 902 S.W.2d 88, 102 (Tex. App.CEl Paso 1995, pet.
ref=d) (holding that
appellate court could not consider studies attached to appellant=s brief because they
were not introduced at trial).  Further,
as an intermediate appellate court, we are bound to follow the law declared by
the court of criminal appeals on matters pertaining to the enforcement of criminal
laws.  See Flores v. State, 883
S.W.2d 383, 385 (Tex. App.CAmarillo 1994, pet.
ref=d).  The standards set forth above govern the
admissibility of the complained-of identifications.





[5]See Jackson v.
Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Steadman v. State, 280
S.W.3d 242, 246 (Tex. Crim. App. 2009); Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007); Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006).